UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:16-CV-00136-TBR

K.C., A MINOR, BY AND THROUGH HIS PARENTS,
T.C. AND K.C.,                                                                    PLAINTIFFS

v.

BOARD OF EDUCATION OF MARSHALL
COUNTY SCHOOLS, BENTON, KENTUCKY,                              DEFENDANT

**MEMORANDUM OPINION**

This matter is before the Court on Defendant Marshall County Board of Education's

motion for summary judgment, [DN 21.] Plaintiff K.C., by and through his parents T.C. and

K.C., responded to Defendant's motion, [DN 22], and Defendant replied, [DN 25.] Fully briefed,

this matter is now ripe for consideration. For the reasons discussed below, Defendant's motion

for summary judgment is **GRANTED**. The Court will enter a separate Order and

Judgment consistent with this Memorandum Opinion.

BACKGROUND

Plaintiff, K.C., is a minor child with cerebral palsy. [DN 1 at 3 (Complaint).] K.C.'s

condition renders him unable to communicate verbally and requires that he receive his nutrition

through a gastronomy tube in his stomach. [*Id.*] At the times relevant to this complaint, K.C.

attended Central Elementary, a Marshall County public school. [*Id.*] During the 2015-2016

school year, K.C. was placed in a "functional mental disability" classroom in which he was

taught by a special education teacher, Crystal Teckenbrock. [*Id.*; DN 21-1 at 1.] Near the end of

April 2016, K.C.'s mother, T.C., "received a report from a mother of a classmate . . . that KC

was being abused by" Teckenbrock. [DN 21-4 at 6 (T.C. Deposition).] The classmate's mother,

Heather Lane, informed T.C. that her child "had c[o]me home upset and kept telling her that  . . .

1

the teacher, Ms. Crystal, is . . . being mean to KC and that she feels really bad for him." [*Id.* at 6–7.] In detail, T.C. testified that Lane told her that Lane's child "said that [Teckenbrock is] mean. She yells at him. She gets in his face. He sits in timeout for long periods of time . . . She yanks him and is very rough with him." [*Id.* at 8.]

Not long after her phone call from Lane, on approximately April 29, 2016, T.C. and K.C's father, whose initials are also K.C., spoke with Joanna Cash, a classroom aide in K.C.'s classroom with Teckenbrock in the parking lot of a Cracker Barrel. [*Id.* at 14–15.] During that conversation, T.C. claims that Cash told her that she "[wa]s tired of crying herself to sleep because she's witnessed Ms. Crystal abusing K.C." [*Id.* at 15.] "She witnessed . . . her pull his hair, verbally screaming at him, in his face," and "him being in timeouts for lengthy amount[s] of time," sometimes for hours at a time. [*Id.* at 15–16.] T.C. testified that, during their meeting, Cash provided her with a "typed letter of concerns" with items for T.C. "to check into that [Cash] had concerns about." [DN 22-4 at 7 (T.C. Deposition).] K.C.'s parents recorded their conversation with Cash. [DN 22-4 (Transcript of Conversation); DN 22-5 (K.C. Deposition).] Following these events, K.C.'s parents removed him from school for the remainder of the school year. [DN 22-8 (T.C. Declaration).]

On May 1, 2016, K.C.'s parents went to the Marshall County Sherriff's Office to report the alleged abuse of K.C. occurring in Teckenbrock's classroom. [DN 22-4 at 5.] The parties agree that May 1, 2016 "was the first time [K.C.'s parents] reported any alleged mistreatment of KC within the Marshall County School District to anyone." [*Id.*] K.C.'s father testified that he played the recording of his and T.C.'s conversation with Cash at the Sherriff's office. [DN 22-5 at 40.]

Stephen Flatt, the Director of Special Education at Marshall County Schools, testified that he found out about the allegations against Teckenbrock when he received a call from Pat Gold, the Interim Principal at Central Elementary at the time. [DN 22-7 at 11 (Flatt Deposition).] Flatt testified that Gold indicated that she had received a call from the Sherriff's Department regarding allegations of abuse of K.C., and that the Department would be conducting an investigation. [*Id.*] Ray Chumbler, the "school resource officer" ("SRO") was in charge of that investigation. [*Id.* at 11–12.] An SRO is "a joint partnership between [Marshall County Schools] and the Marshall County Sherriff's Department." [DN 22-6 at 15 (Lovett Deposition).] At Interim Principal Gold's request, Flatt sat in on each interview Officer Chumbler conducted. [DN 22-7 at 13–15.]  Officer Chumbler interviewed Jennifer Parker[1], Joanna Cash, and Crystal Teckenbrock. [*Id.* at 15.] Officer Chumbler's questions were "[t]rying to find out if they had witnessed or seen anything in regards to abuse or neglect or the treatment of KC." [*Id.* at 17.] According to Flatt, Jennifer Parker stated that she "had not seen anything that she would consider to be abuse or neglect or mistreatment." [*Id.*]

Flatt testified that, during Cash's interview, she explained that she once heard a "swatting" noise coming from the room in which Teckenbrock was changing K.C.'s clothes, but that she did not know who was doing the swatting. [*Id.* at 19–22.] Flat also explained that Cash referenced a hair-pulling incident, but explained that Teckenbrock was merely trying to pull K.C.'s hands out of his hair to prevent him from pulling his own hair. [*Id.* at 22.] Flatt could not recall Cash stating that she had witnessed Teckenbrock scream in K.C.'s face or leave K.C. in time out for extended periods. [*Id.* at 22–24.] However, Cash testified that, during her interview with Officer Chumbler, she did tell him that she had seen Teckenbrock pull K.C's hair, scream in

---

[1] At some point between the events giving rise to Plaintiffs' claims and the instant litigation, Jennifer Parker's name changed to Jennifer Love.

his face, and that she heard her spank him. [DN 22-1 at 32.] However, Cash testified that she did not prepare the document that she gave to K.C.'s parents at Cracker Barrel which had a list of questions for K.C.'s parents to check into. [*Id.* at 17.] Cash was unable to say who did prepare it, however. [*Id.*]

By declaration, K.C.'s father averred that he called Officer Chumbler on May 2, 2016 to offer him the recording of the conversation with Cash and the list of questions and answers that Cash provided to them at Cracker Barrel. [DN 22-9 (K.C. Declaration). According to K.C.'s father, "[h]e said it was not needed because he already made his conclusions of no abuse. He said it sounded like an 'unruly' situation to him and he was finished with his investigation." [*Id.*]

Flatt testified that, at the conclusion of the interviews, Officer Chumbler informed him that he did not see "any way to . . . prove that this really took place based on . . . what I found and what they've said . . . they can't make a case on this." [DN 22-7 at 29.] "He basically said, you know, he can't prove it happened." [*Id.*] Flatt, in turn, informed Superintendent Trent Lovett that Officer Chumbler "found no incidents of wrongdoing." [DN 22-6 at 14 (Lovett Deposition).]

After Officer Chumbler's investigation, Flatt and Lovett had a meeting with T.C., Heather Lane, and another parent named Amber Harris on May 5, 2016. [*Id.* at 16, 26.] At that meeting, the parents provided Lovett with a bulleted list of concerns, including "abuse and neglect" the "[d]aily log not even being looked at by teacher," and "[t]imeout for up to four hours." [*Id.* at 18–20.] Lovett testified that the parents told him Teckenbrock frequently discussed T.C.'s personal life and called her "monster" in front of the students. [*Id.* at 21.] At the conclusion of the meeting, Lovett informed the parents that the school would further investigate the situation. [*Id.* at 22.]

Lovett assigned Flatt and Abby Griffy, Marshall County's Elementary Supervisor, to conduct a second investigation. [DN 22-6 at 22.] Lovett advised them to investigate each of the items on the bulleted list that was provided to him during his meeting with T.C., Lane, and asked Harris to write a report summarizing their findings. [*Id.* at 22–24.] Flatt and Griffy interviewed Teckenbrock and the instructional aides, Cash, Lindsay Hall, and Jennifer Parker. [DN 22-7 at 31.] According to Flatt, Teckenbrock denied that she had engaged in any abuse or neglect. [*Id.* at 34.] Flatt also testified that Cash was again "kind of wishy-washy" regarding what she had seen. [*Id.*] "She was kind of noncommittal," and referred back to what she'd said in her interview with Officer Chumbler. [*Id.* at 34–35.] Flatt "got the feeling that she just . . . wasn't sure if what she was saying was mistreatment of students or not." [*Id.* at 36.] Flatt also testified that Cash told them she had not contacted any parents. [*Id.*] Cash did, however, mention that "sometimes she didn't think there was enough going on in the room, and there was maybe sitting – the[] [kids] were just sitting there." [*Id.* at 39." The report reflects that Cash stated "[n]othing is being done to help these kids." [*Id.* at 40.] The parties agree that neither Officer Chumbler nor Flatt and Griffy interviewed K.C.'s parents or any special needs students during their investigations.

Lovett testified that he received the report from Flatt and Griffy on the 12th or 13th of May, but did not report back to T.C., Lane, and Harris because he received a call shortly after notifying him that the Department of Child Based Services ("DCBS") would be conducting its own investigation into a complaint filed with them. [DN 22-6 at 29.] The day he learned that DCBS would be conducting an investigation, Lovett removed Teckenbrock from the classroom setting. [*Id.* at 36.]

As far as Lovett recalled, DCBS interviewed him, Interim Principal Gold, the instructional assistants (Cash, Parker, and Hall), Teckenbrock, and Flatt. [*Id.* at 32.] According to

Lovett, DCBS did not inform him of its findings until late July, 2016. [*Id.* at 33.] DCBS reportedly did not substantiate abuse in Teckenbrock's classroom, but it did substantiate neglect. [*Id.*] Lovett asked to see the evidence DCBS uncovered in its investigation, but DCBS informed him that it could not share that information. [*Id.* at 34.]

Though Teckenbrock's May 13, 2016 removal from the classroom setting was initially intended to be temporary "until all of this was settled," Teckenbrock remains removed from the classroom today. [*Id.* at 36.] Now, she works in the technology department in the office of the Marshall County Board of Education [*Id.* at 42.] Teckenbrock does not currently work with children. [*Id.*] No one from the school informed T.C., Lane, or Harris "of the remedial measure of putting her in the tech department," however. [*Id.*]

In August 2016, K.C., by and through his parents, T.C. and K.C., (collectively, "Plaintiffs") brought the instant lawsuit. [DN 1.] Herein, Plaintiffs make claims for violations of Title II of the Americans with Disabilities Act ("ADA") and § 504 of the Rehabilitation Act ("§ 504"). [*Id.* at 7.] The parties engaged in discovery, and the Marshall County Board of Education (the "Board" or "Defendant") filed the instant motion for summary judgment on all of Plaintiffs' claims. For the reasons discussed in detail below, that motion will be granted.

STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court "may not make credibility determinations nor weigh the evidence when determining

whether an issue of fact remains for trial." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001); *Ahlers v. Schebil*, 188 F.3d 365, 369 (6th Cir. 1999)). "The ultimate question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Back v. Nestlé USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012) (quoting *Anderson*, 477 U.S. at 251–52).

The moving party must shoulder the burden of showing the absence of a genuine dispute of material fact as to at least one essential element of the nonmovant's claim or defense. Fed. R. Civ. P. 56(c); *see also Laster*, 746 F.3d at 726 (citing *Celotex*, 477 U.S. at 324). Assuming the moving party satisfies its burden of production, the nonmovant "must—by deposition, answers to interrogatories, affidavits, and admissions on file—show specific facts that reveal a genuine issue for trial." *Laster*, 746 F.3d at 726 (citing *Celotex*, 477 U.S. at 324). The test is "whether the party bearing the burden of proof has presented a jury question as to each element in the case." *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). Nor will mere speculation suffice to defeat a motion for summary judgment: "[t]he mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

## DISCUSSION

### A. Discrimination Under Title II of the ADA and § 504 of the Rehabilitation Act

Plaintiffs allege that the Board violated Title II of the ADA and § 504 of the Rehabilitation Act by failing to ensure that K.C. was safe from harassment and that he received an equal access to education. [DN 1 at 7.] "The Americans with Disabilities Act and the

Rehabilitation Act combat discrimination against disabled individuals." *Gohl v. Livonia Pub. Sch. Sch. Dist.*, 836 F.3d 672, 681 (6th Cir. 2016), *cert. denied*, 138 S. Ct. 56 (2017). Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, § 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). "Each Act allows disabled individuals to sue certain entities, like school districts, that exclude them from participation in, deny them benefits of, or discriminate against them in a program because of their disability." *Gohl*, 836 F.3d at 681 (citing *Anderson v. City of Blue Ash*, 798 F.3d 338, 357 (6th Cir. 2015); *G.C. v. Owensboro Pub. Sch.*, 711 F.3d 623, 635 (6th Cir. 2013)).

The Sixth Circuit has clarified that, aside from § 504's use of the word "solely" and its limitation only to federally funded entities, "the reach and requirements of both statutes are precisely the same." *S.S. v. E. Kentucky Univ.*, 532 F.3d 445, 452–53 (6th Cir. 2008) (quoting *Weixel v. Bd. of Educ. of N.Y.,* 287 F.3d 138, 146 n. 6 (2d Cir. 2002)). "Neither of these differences between the ADA and § 504 is at issue in [K.C.]'s case. We will therefore analyze [K.C.]'s ADA and § 504 claims together." *Id.* at 453; *see also M.G. by & through C.G. v. Williamson Cty. Sch.*, No. 17-5300, 2018 WL 327447, at *6 (6th Cir. Jan. 9, 2018) ("Claims brought under the ADA and Section 504 generally are evaluated together.").

The parties do not wholly agree on the applicable standard in this case. In its motion for summary judgment, the Board, citing *S.S. v. Eastern Kentucky University*, 532 F.3d 445 (6th Cir. 2008), asserts that the applicable standard requires K.C. to prove the following:

> (1) the plaintiff is an individual with a disability, (2) he or she was harassed based on that disability, (3) the harassment was sufficiently severe or pervasive that it altered the condition of his or her education and created an abusive educational environment, (4) the defendant knew about the harassment, and (5) the defendant was deliberately indifferent to the harassment.

[DN 21-1 at 6 (citing *S.S.*, 532 F.3d at 454).] In response, Plaintiffs correctly point out that the standard identified in *S.S. v. Eastern Kentucky University* dealt with "disability-based peer-on-peer harassment" rather than disability-based "teacher-on-student" harassment, which K.C. alleges here. [DN 22 at 8 (citing *S.S.*, 532 F.3d at 453–55).] However, Plaintiffs do not offer an alternate standard upon which it believes the Court should instead rely. Plaintiffs also do not explain to the Court why the fact that the alleged harassment in this case came from a teacher would require the application of a different standard than the above standard for harassment by a peer. Rather, Plaintiffs merely go on to discuss the Sixth Circuit's definition of deliberate indifference and argue why the Board meets that definition here. [*Id.*]

A review of Sixth Circuit case law in the realm of harassment or discrimination in education reveals a number of different standards in addition to the disability-based peer-on-peer harassment standard discussed above. In the context of allegations that a school acted discriminatorily when it failed to provide a disabled student with appropriate physical and occupational services, the Sixth Circuit has stated that "a plaintiff seeking to state a claim under either the ADA or § 504 against a school . . . must show that he or she is (1) disabled under the statute, (2) 'otherwise qualified' for participation in the program, and (3) being excluded from

participation in, denied the benefits of, or subjected to discrimination under the program by reason of his or her disability." *M.G. by & through C.G.*, 2018 WL 327447, at *6.

In the context of teacher-on-student sexual harassment under Title IX, many principles of which have been applied to the ADA and § 504, the Sixth Circuit has held that "[i]f a plaintiff proves that (1) a school district had actual notice of the sexual harassment; and (2) exhibited deliberate indifference in light of such notice, a school district may be held liable for damages." *McCoy v. Bd. of Educ., Columbus City Sch.*, 515 F. App'x 387, 391 (6th Cir. 2013).

As an initial matter, it appears to the Court that the disability-based peer-on-peer harassment standard identified *S.S. v. Eastern Kentucky University* applies with ease to this case, despite the fact that this case involves the slightly different situation of alleged disability-based teacher-on-student harassment. And though Plaintiffs emphasize this difference, they do not offer an alternate standard. However, Plaintiffs do go on to argue that the Board had knowledge and acted with deliberate indifference in this case. Indeed, Plaintiffs spend nearly five pages of their response arguing why the Board was deliberately indifferent. [DN 22 at 9–13.]

At a bare minimum, therefore, it appears the parties agree that Plaintiffs must show deliberate indifference on the part of the Board in order to succeed on their claims. Accordingly, the Court will "assume without deciding that the parties are correct on this point." *R.K. ex rel. J.K. v. Bd. of Educ. of Scott Cty., Ky.*, 637 F. App'x 922, 925 (6th Cir. 2016) ("R.K. seeks money damages. The parties agree that, to obtain money damages under the ADA and the Rehabilitation Act, R.K. must show that the school board acted with 'deliberate indifference' towards his federally-protected rights . . . (We assume without deciding that the parties are correct on this point, *see Hill v. Bradley Cnty. Bd. of Educ.,* 295 Fed. App'x. 740, 742 (6th Cir. 2008)).").

Therefore, the Court finds that Plaintiffs must show deliberate indifference on the part of the Board to survive summary judgment.

## B. Deliberate Indifference

In the education context, school officials act with deliberate indifference when they have knowledge of alleged harassment and respond, or fail to respond, "in a manner that is [ ] 'clearly unreasonable in light of the known circumstances.'" *Stiles ex rel. D.S. v. Grainger Cty., Tenn.*, 819 F.3d 834, 848 (6th Cir. 2016) (quoting *Davis v. Monroe Cnty. Bd. of Educ.,* 526 U.S. 629, 648 (1999)).[2]; *see also Vance v. Spencer Cty. Pub. Sch. Dist.*, 231 F.3d 253, 260 (6th Cir. 2000) (quoting *Davis*, 524 U.S. at 648) ("[A] plaintiff may demonstrate defendant's deliberate indifference to discrimination 'only where the [defendant]'s response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances.'"). "Put differently, deliberate indifference arises when 'school officials are aware of the misconduct but do nothing to stop it, despite [the school district's] ability to exercise control over the situation.'" *McCoy*, 515 F. App'x at 391 (quoting *Horner v. Ky. High Sch. Athletic Assn.,* 206 F.3d 685, 692 (6th Cir. 2000)). A school district's "deliberate indifference must, at a minimum, 'cause [students] to undergo' harassment or 'make them liable or vulnerable' to it.'" *Id.* (quoting *Davis*, 526 U.S. at 644).

### 1) Deliberate Indifference to Alleged Harassment or Abuse

In its motion for summary judgment, the Board argues, first, that it could not have been deliberately indifferent to any alleged mistreatment of K.C. prior to May 1, 2016, because it

---

[2] While *Stiles*, relying on *Davis*, addressed deliberate indifference in the Title IX context, the Sixth Circuit has noted that *Davis*, which "requires a showing of deliberate indifference on the part of the school in order to impose liability, [ ] has been applied to disability-based peer-on-peer harassment claims brought under the ADA and § 504 by the majority of federal district courts to have addressed the issue." *S.S.*, 532 F.3d at 453. Accordingly, the Sixth Circuit also applies *Davis*'s deliberate indifference standard to ADA and § 504 claims.

never had notice of any mistreatment before that date, and because K.C. never attended school in Marshall County again after that date. [DN 22-1 at 9.] The parties agree that K.C.'s last day of school was on Friday, April 29, 2016, and that he never returned to school in Marshall County after that date. [DN 22-5 at 41; DN 22-8.] K.C.'s parents also concede that when they went to the Marshall County Sherriff's Office on Sunday, May 1, 2016, "that was the first time [they] reported any alleged mistreatment of KC within the Marshall County School District to anyone." [DN 22-4 at 5.] Then, on May 13, 2016, after Lovett learned that DCBS would be conducting its own investigation, Lovett removed Teckenbrock from the classroom and into an office setting where she did not work with children. Teckenbrock remains removed from the classroom today.

The only argument Plaintiffs make in opposition to the Board's argument that it could not have been deliberately indifferent before May 1, 2016 is that the Board "failed to train its aide on reporting child abuse over the head of the teacher. In doing so, Defendant disregarded a known or obvious *consequence of its action*—that a special needs child, who cannot report abuse himself, could not escape the abuser." [DN 22 at 9.] However, the evidence does not support a finding that Defendant failed to adequately train its instructional aides. In her deposition, Jennifer Love (formerly Jennifer Parker) testified that, at the beginning of each school year, teachers and aides attend a meeting in which the principal covers the definitions of abuse and neglect. [DN 22-3 at 10 (Jennifer Love Deposition).] Love testified that, if aides "were to witness abuse or neglect in a classroom," their duty is "[t]o report it to [the] administration." [*Id.*] Love testified that she would first report to the principal, and then to the assistant principal if the principal was unavailable. [*Id.* at 10–11.]

Similarly, Cash testified in her deposition that she receives a copy of the employee handbook every year, which covers reporting child abuse. [DN 22-1 at 72–75.] Cash further

testified that, if she suspected a student was being abused, she would first report to the teacher, but if the teacher was the person suspected of abusing the student, then she would report to the principal. [*Id.* at 75–76.] Cash explicitly stated that she was aware she could go to the principal to report abuse as of the 2015-2016 school year. [*Id.* at 76.] In sum, the evidence belies a finding that the instructional aides were inadequately trained regarding the procedures for reporting child abuse and therefore that the Board acted deliberately indifferent to abuse in that regard. Aside from this argument, which the Court finds unpersuasive, Plaintiffs do not appear to dispute that the Board could not have been deliberately indifferent prior to May 1, 2016, when they first had notice of the alleged mistreatment. And because K.C. never again attended Marshall County schools again *after* the Board had notice of the alleged mistreatment, the Court agrees that it could not have been deliberately indifferent to K.C.'s abuse before that time.

### 2) Deliberate Indifference in Responding to Allegations of Harassment or Abuse

Plaintiffs next argue, however, that the Board's response once it did have notice of the alleged abuse after May 1, 2016 was inadequate and amounted to deliberate indifference. Specifically, Plaintiffs argue that the first investigation, conducted by Officer Chumbler, failed to give sufficient weight to Cash's testimony that she *had* witnessed mistreatment of K.C. by Teckenbrock. [DN 22 at 4.] In her deposition, Cash testified that her interview with Officer Chumbler covered whether "there w[ere] any instances of any abuse or any sort of physical situations." [DN 22-1 at 13.] She further testified that she told Officer Chumbler that she had seen Teckenbrock pull K.C.'s hair and scream in his face. [*Id.* at 32.] Flatt, on the other hand, who sat in on each of Officer Chumbler's interviews, stated that Cash referenced a hair-pulling incident, but explained that Teckenbrock was merely trying to pull K.C.'s hands out of his hair to prevent him from pulling his own hair. [DN 22-7 at 22.] Flatt also could not recall Cash stating

that she had witnessed Teckenbrock scream in K.C.'s face or leave K.C. in time out for extended periods. [*Id.* at 22–24.] Accordingly, what Cash told Officer Chumbler during her interview with him is somewhat in dispute.

During the second investigation, during which Lovett assigned Flatt and Griffy to interview Teckenbrock and the instructional aides, Cash was interviewed again. However, Cash testified that she did not tell Flatt and Griffy that she had seen any hair-pulling or screaming or heard any spanking during her meeting with them because they did not ask those questions and "[t]hat's not what the conversation was about." [*Id.* at 33–34.] According to Cash, her meeting with Flatt and Griffy was geared only toward matters of internal classroom operations. [*Id.* at 35.] Flatt testified otherwise; he contends that he did "reask the question that Mr. Chumbler asked to each of these persons as to whether they witnessed any abuse or neglect or mistreatment by Ms. Teckenbrock." [DN 22-7 at 34.] Therefore, whether Flatt and Griffy questioned the interviewees about abuse is disputed. According to Flatt, when asked about any mistreatment, Cash was "wishy-washy" and "noncommittal" in her answers. [*Id.*] Flatt did not recall Cash saying Teckenbrock screamed in K.C.'s face, but did recall her saying that "[n]othing is being done to help these kids. They are just sat in a chair." [*Id.* at 40.] After Flatt and Griffy's investigation concluded sometime between May 11 or 12, 2016, Lovett testified that he received a call shortly after from DCBS indicating that they would also be conducting an investigation. It was then, on May 13, that he removed Teckenbrock from the classroom to work in the Board's office.

According to Plaintiffs, Flatt and Griffy's investigation exhibited deliberate indifference because it was "results-oriented," did not ask specific questions about abuse, and failed to interview K.C.'s parents, who could have provided them with the recording of their conversation

with Cash or the document she gave them. [DN 22 at 5–6.]  According to Plaintiffs, "failure to investigate abuse—in the face of complaints *about* abuse, and instruction from the Superintendent to investigate *abuse*—is also 'disregarding a known risk.'" [*Id.* at 10.] However, regardless of whether Flatt and Griffy's investigation was adequate, K.C. was never subjected to a risk of further harassment because he was removed from school and, soon after, Teckenbrock was removed from the classroom. Importantly, "[t]he deliberate indifference must, at a minimum, 'cause [students] to undergo' harassment or 'make them liable or vulnerable' to it." *McCoy*, 515 F. App'x at 391 (quoting *Davis*, 526 U.S. at 648). That was simply not the case here; K.C. was never made vulnerable to experiencing additional harassment after the Board had notice of the alleged mistreatment because he was never in Teckenbrock's classroom again after that time. Plaintiffs have pointed to no case law suggesting that an alleged insufficient investigation into allegations of misconduct, without more, constitutes deliberate indifference. Rather, deliberate indifference must somehow result in harassment or make students vulnerable to continued harassment. Here, the last day K.C. attended school was Friday, April 29. K.C. never returned to school. Thus, even if the ensuing investigation was inadequate, it did not subject K.C. to further harassment.

In contrast, in cases in which courts have found that school officials have exhibited deliberate indifference include situations in which repeated reports went ignored and students continued to be abused or harassed. For instance, in *S.S. v. Eastern Kentucky University*, the court, citing two other cases, explained the deliberate indifference standard:

> The cases of *K.M.* and *Biggs* are instructive in determining whether Model's actions evinced a deliberate indifference to S.S.'s situation. In *K.M.,* a disabled child had repeatedly been subjected to verbal abuse and physical attacks over the course of two middle-school years, including disability-related slurs. The student and his mother reported each incident to the school, but school officials initially took no action to protect him from further harassment. After the student was

beaten up on a schoolbus, the school advised his mother to keep him out of school for an indeterminate period of time, but provided no educational services for him. Furthermore, no one was disciplined in connection with the incidents, which caused the student to become suicidal. He subsequently sued the school under the ADA and § 504 for inadequately responding to the peer-on-peer disability-based harassment. The district court denied the school's motion for summary judgment, concluding that triable issues of fact existed with respect to the school district's lack of response to the student's repeated complaints.

. . .

*Biggs* similarly involved a disabled student and her mother who reported incidents of harassment to school administrators. But in *Biggs* the school took action each time, including counseling the child, meeting with the offending students, sending letters to parents, threatening the offenders with suspension, and alerting teachers to the problem. Concluding that such responses established that the school was not deliberately indifferent to the harassment, the court granted the school's motion for summary judgment. 229 F.Supp.2d at 445.

*S.S.*, 532 F.3d at 455 (citing *K.M. ex rel. D.G. v. Hyde Park Cent. Sch. Dist.*, 381 F. Supp. 2d

343, 348–51 (S.D.N.Y. 2005); *Biggs v. Bd. of Educ. of Cecil Cty., Maryland*, 229 F. Supp. 2d

437, 445 (D. Md. 2002)).

Indeed, in nearly every case discussing deliberate indifference regarding a school's

*response* to reports of harassment, abuse, or discrimination, the Sixth Circuit's focus has been on

whether the school "could have or should have done [things] differently in order to bring the . . .

harassment to a *stop*." *Id.* at 455 (emphasis added) ("Model, unlike the schools in *K.M.* and

*Davis,* took the affirmative steps described above to address the incidents of harassment

involving S.S. And Model's actions closely mirrored those of the school in *Biggs*—specifically,

meeting with the students, communicating with parents, and disciplining the offending

students."); *Stiles ex rel. D.S.*, 819 F.3d at 849 ("We agree with the district court that Plaintiffs

failed to create a triable issue as to whether Defendants exhibited deliberate indifference to DS's

situation. As the district court observed, each time DS or his mother communicated a specific

complaint of harassment, the school investigated promptly and thoroughly by interviewing DS,

interviewing other students and teachers, taking detailed notes, and viewing video recording when available. At the conclusion of each investigation, the administrators disciplined students found guilty of wrongdoing either with a verbal warning or a suspension."); *McCoy*, 515 F. App'x at 392 ("Here, the known circumstances were sparse; prior to Doe's allegations, the school was made aware of several instances of physical contact that were ostensibly non-sexual but could have served as potential indicia for sexual malfeasance. Confronting these facts, the school district conducted an informal investigation in each instance, responding with either a directive to Stroup not to engage in physical contact or no action if the investigation was inconclusive. In hindsight, the school district could certainly have done more. But this is not the standard by which we impose liability. Rather, we look to whether the school district's actions were clearly unreasonable so as to rise to the level of deliberate indifference."); *Vance*, 231 F.3d at ("In the instant case, Spencer failed to respond in light of the known circumstances. On one occasion . . . [w]ith the exception of talking to the student, there was no evidence before the jury or this Court that Spencer took any other action whatsoever. On another occasion . . . the only evidence before the jury evincing Spencer's response is that a class room teacher spoke to the boys and Alma. There is no evidence before this Court that Spencer ever disciplined the offending students nor informed law enforcement as a result of any of these incidents. On yet another occasion, Alma's mother filed a detailed complaint with Spencer's Title IX coordinator. An investigation, however, never resulted. These three incidents alone reflect a deliberate indifference in light of the known circumstances."); *Soper v. Hoben*, 195 F.3d 845, 855 (6th Cir. 1999) ("In the case at bar, defendants did not have actual knowledge of the harassment until after the fact and plaintiffs have failed to present any evidence of deliberate indifference attributable to defendants. Once they did learn of the incidents, they quickly and effectively corrected the

situation. Defendants immediately contacted the proper authorities, investigated the incidents themselves, installed windows in the doors of the special education classroom, placed an aide in Harmala's classroom, and created student counseling sessions concerning how to function socially with the opposite sex.").

Here, after Officer Chumbler's investigation concluded and Officer Chumbler determined that he could not substantiate abuse, Lovett met with T.C., Lane, and Harris on May 5, 2016. During that meeting, the parents voiced several remaining concerns about Teckenbrock's classroom. After that, Lovett assigned Flatt and Griffy to investigate a second time. After that investigation concluded, on May 11 or 12, and Lovett learned that DCBS would be conducting a third investigation, Lovett removed Teckenbrock from the classroom on May 13. Teckenbrock has remained in the Board office ever since, not working with children. Plaintiffs are correct that the contents of parts of Officer Chumbler and Flatt and Griffy's investigations are factually disputed. They also contend that the Board could have done more, such as remove Teckenbrock from the classroom sooner or interview K.C.'s parents about what Cash told them. However, ultimately, the Court does not find these matters to be probative in light of the fact that K.C. never attended school again after April 29, 2016 and therefore was never forced to undergo further harassment or made more "'liable or vulnerable' to it." *McCoy*, 515 F. App'x at 391 (quoting *Davis*, 526 U.S. at 648).

Moreover, at the time the investigations took place, "the known circumstances were sparse." *Id.* at 392. At the conclusion of Flatt and Griffy's investigation, Flatt "felt like there was not any inappropriate touching based on [his] investigation." [DN 22-7 at 47.] And though DCBS ultimately substantiated neglect, they could not substantiate abuse. [DN 22-6 at 33.] Moreover, DCBS refused to release their evidence of neglect to the Board. [*Id.* at 32–33.] In

sum, based on the allegations the Board had, the Court cannot say that its actions were clearly unreasonable. Indeed, the Sixth Circuit has explained that, even in situations in which, "[i]n hindsight, the school district could certainly have done more," "this is not the standard by which we impose liability. Rather, we look to whether the school district's actions were clearly unreasonable so as to rise to the level of deliberate indifference." *Id.* (citing *Davis,* 526 U.S. at 648). The Court cannot say this was the case here.

### 3) Deliberate Indifference to K.C.'s Right to Education

Finally, Plaintiffs argue that the Board was deliberately indifferent to K.C.'s federally protected right to education by failing to communicate with them regarding the results of their investigation and the removal of Teckenbrock from the classroom. [DN 22 at 11.] According to Plaintiffs, this resulted in a loss of K.C.'s valuable education time. [*Id.* at 11–12.] The Sixth Circuit has recognized that a school "acts with deliberate indifference if it disregards a 'known or obvious consequence' of its actions, namely that its actions will violate the plaintiff's federally-protected rights. *R.K. ex rel. J.K.*, 637 F. App'x at 925. However, that argument fails here for two reasons. First, the Sixth Circuit has held that, "[t]o prove discrimination in the education context, something more than a mere failure to provide the free appropriate education . . . must be shown." *S.S.*, 532 F.3d at 453 (quoting *Sellers v. Sch. Bd. of Manassas,* 141 F.3d 524, 528–29 (4th Cir. 1998)).

Second, under both the ADA and § 504, on which Plaintiffs base their claims, Plaintiffs must show that K.C. was "excluded from participation in or [ ] denied the benefits of the services, programs, or activities of [Marshall County Schools], or [was] subjected to discrimination by" the Board either "*by reason of*" his disability or "*solely by reason of* . . . his disability." 42 U.S.C. § 12132 (emphasis added); 29 U.S.C. § 794(a) (emphasis added). As an

initial matter, Plaintiffs have not shown that the Board denied K.C. participation in or excluded him from school. Rather, Plaintiffs merely argue that the Board did not adequately communicate with them regarding their investigation and the removal of Teckenbrock from the classroom. And while it would seem reasonable for the Board to have communicated with K.C.'s parents regarding these issues, the fact that they did not does not show that it went so far as to deny K.C. education or exclude him from it. Plaintiffs have introduced no evidence that they attempted to obtain information from the Board and that the Board refused their requests. Moreover, Plaintiffs have presented no evidence that, for example, they desired to return K.C. to school but that the Board failed to cooperate or accommodate K.C. to ensure he was not mistreated. What's more, there is no evidence that any failure by the Board to adequately communicate with Plaintiffs or failure to seek K.C.'s return to school occurred "because of" or "solely by reason of" K.C.'s disability. This is the crux of ADA and § 504 claims. Without any evidence as to these findings, Plaintiffs' claims cannot proceed to trial.

The Court does not take Plaintiffs' allegations lightly. The allegations of mistreatment of K.C. by Teckenbrock are offensive and reprehensible. However, the question before the Court in an ADA and § 504 case is "whether the independent misconduct of a teacher is attributable to the school [board] that employs h[er] under a specific federal statute designed primarily to prevent recipients of federal financial assistance from using the funds" in a manner that discriminates against individuals with disabilities. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 292 (1998).[3] Though the Court finds that it cannot be so attributed in this case, this "decision does not affect any right of recovery that an individual may have against a school district as a matter of state law or against the teacher in h[er] individual capacity under state law or under 42 U.S.C.

---

[3] Though *Gebster* was a case addressing the sexual harassment of a student by a teacher under Title IX, *Gester*, 524 U.S. at 292, the Sixth Circuit has noted that many Title IX principles, including the notice and deliberate indifference standards, also apply to ADA and § 504 cases. *S.S.*, 532 F.3d at 453; *see supra* note 2.

§ 1983. *Id.* Here, however, due to an absence of evidence as to the Board's deliberate indifference or denial of education to K.C. on the basis of his disability, Plaintiffs claims under the ADA and § 504 fail as a matter of law.

CONCLUSION

For the reasons explained fully above, Defendant Marshall County Board of Education's motion for summary judgment, [DN 21], is **GRANTED**. The Court will enter a separate Order and Judgment consistent with this Memorandum Opinion.

Date:  January 29, 2018

cc:      Counsel

Thomas B. Russell, Senior Judge
United States District Court